**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**DIANN L. ELLIS,**

      **Plaintiff,**

**vs.**                    **Case No. 4:10cv70-SPM/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).  It is recommended that the decision of the Commissioner be reversed and remanded.

**Procedural status of the case**

Plaintiff, Diann L. Ellis, applied for social security disability insurance benefits on September 1, 2006, alleging onset of disability on August 31, 2006.  Plaintiff has been found to be disabled commencing on November 25, 2008, based upon a subsequently filed application.  Therefore, this appeal considers only whether Plaintiff is entitled to

disability benefits for the closed period from August 31, 2006, through November 24, 2008.

Plaintiff alleges disability due to peripheral artery disease (PAD) with leg swelling and pain, diabetes mellitus, high blood pressure, and anxiety. R. 18, 69, 71, 120-24, 133. Plaintiff was 55 years old at the time of her alleged onset of disability. R. 120. Plaintiff has a high school education, earned a corrections certificate, and has past relevant work as a correctional officer from July, 1994, to August 31, 2006, and as a lab technician (quality control technician) from 1983 to 1993. R. 33, 69, 122, 126, 139, 145, and 227.

The Administrative Law Judge found that Plaintiff was not disabled. R. 18-27. The ALJ found Plaintiff had not engaged in substantial gainful activity since her alleged onset date, and had severe impairments of peripheral artery disease and diabetes mellitus. R. 20. At step three, the ALJ concluded that none of Plaintiff's impairments, either alone or in combination, met the criteria for a listed impairment in Appendix 1, Subpart P, 20 C.F.R. § 404, especially Listing 4.12. R. 22. At step four, the ALJ found Plaintiff had the residual functional capacity to do a limited range of light work, but must "avoid concentrated exposure to extreme cold and heat." R. 22. In an 8 hour work day, the ALJ concluded that Plaintiff could "sit, stand and walk for about 6 hours each with limited breaks and can lift 20 pounds occasionally and 10 pounds frequently."[1] R. 22.

---

[1] The Commissioner's rules define "light work" in part:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the

The ALJ determined that Plaintiff had good ability to "read, write and use numbers" and suffered from "no other manipulative, postural, visual, communicative, environmental or mental limitations." *Id.* The ALJ found Plaintiff can perform her past relevant work as a quality control technician as it is generally performed in the national economy. R. 26-27. The ALJ found Plaintiff's allegations of symptoms and limitations were "not credible to the extent they [were] inconsistent with" her functional residual capacity. R. 23.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002). "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted). The court must give "substantial

---

time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b) and 416.967(b).

deference to the Commissioner's decision."  <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  <u>Barnhart v. Walton</u>, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or
        equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.      Does the individual have any impairments which prevent past
        relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Plaintiff's testimony at the hearing**

        Plaintiff testified that she could lift "about 20 pounds," and could only walk about

"10 or 15 yards" and then she must stop and sit down.  R. 37.  She said her legs "feel

like they're getting heavy, and get to burning."  *Id.*  She said that her back also "starts to

hurt."  *Id.*  She said it hurts when she is standing and walking, and that when standing at

the sink to wash the dishes, she has "to wash a little bit and sit down."  R. 37-39.  She

said she could only stand or remain seated for "about 20 or 30 minutes."  R. 37-38.

Plaintiff testified that she had had two MRIs of her spine and her doctor gave her pain

medication, but she was never referred to a specialist.  R. 41-43.  Plaintiff states that she did not have insurance and could not pay for such care.  R. 44-45.

Plaintiff testified that she takes medication for her diabetes.  R. 45.  She lives with her husband and he does most of the cooking because he is in "better shape than" Plaintiff.  R. 46.  She is able to sit and watch television and read, to go to doctors' appointments, and to visit with her sister who lives nearby.  R. 46-47.  She said that when she is reading or watching television, she is mostly "lying down."  R. 48.  She reads two hours daily, and watches television four hours daily.  R. 50.  She said that she has no problems with concentration or attention.  R. 51.  Plaintiff can drive and generally does the household chores, although her granddaughters help her sometimes.  R. 47.  She said she just moves at a slow pace and takes frequent breaks, about every 10 minutes, because her legs, back, and shoulder "get to hurting."  R. 47-48.  Plaintiff reported that her blood sugars run "about 250, 260" with the insulin.  R. 57.

Plaintiff reported in her "function report" completed on October 3, 2006, that it takes her a long time to do housework, such as laundry and cleaning, because she has to just "do a little at a time" but she said she does not need help.  R. 153; *see also* R. 161, 175.  Plaintiff's husband takes care of the yard work.  R. 154.

**Medical evidence**[2]

In July, 1992, Plaintiff was diagnosed with Type II diabetes.  R. 533.  The physician said that it was expected that Plaintiff would need insulin for life because she was close to her ideal body weight.  R. 533.  On December 17, 1996, Plaintiff hospitalized with claudication[3] in her right let that was interfering with her employment. R. 233.  The "PVR" showed "a pattern compatible with aortoiliac occlusion on the right and aortoiliac occlusive disease on the left with positive exercise test bilaterally."  *Id.* The right femoral pulse was absent, and she had no pulses below the femoral on the right.  *Id.*  The left femoral pulse was "fairly good" and there was left dorsalis pedis.  *Id.* Surgery was successful in correcting a 99% stenosis of the left artery and 80% stenosis of the right artery.  R. 230.  The post-stent angiogram revealed "correction of the stenosis and no pressure gradient was present across the iliac arteries."  *Id.;* R. 235. "After that procedure, her symptoms improved dramatically."  R. 230.

In August of 1998, Plaintiff was hospitalized again with "disabling claudication" of the right leg.  R. 231, 374.  The records reflect that Plaintiff had "developed proximal

---

[2] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at < http://www.pdrhealth.com/drugs/drugs-index.aspx >. Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS, available at:  http://www.mercksource.com (Medical Dictionary link) or MEDICINE NET, found at http://www.medicinenet.com/script/main/hp.asp.  The pages at these websites are not attached to this report and recommendation as the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.

[3] Claudication is limping or lameness.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

claudication of the entire right leg for" six to seven weeks prior to her hospitalization (on August 13, 1998).[4]  R. 231.  She had "an absent right femoral pulse and right leg pain." R. 237.  "The right iliac is totally occluded and there [was] a high grade stenosis of the proximal left iliac."  R. 241.  An aorto right femoral and left iliac bypass graft was performed on September 1, 1998.  *Id.*  Following the procedure, Plaintiff "had palpable pulses at all four pedal locations . . . ."  R. 243.  She had no complications and "maintained bounding pulses in the entire postoperative period."  R. 251.

On August 4, 2003, an x-ray report revealed "mild peripheral vascular disease, both lower extremities."  R. 256.  On August 20, 2003, she reported to Diane Haisten, D.O, that her legs got tired when she walked, and she had joint pain and low back pain. R. 283.

In January, 2004, and again in June, 2004, Plaintiff complained of pain in the middle of her back, ankle swelling, and numb fingers; her blood sugars were "up & down," her diabetes was under "very poor control," and she had diabetic neuropathy and "significant diabetic retinopathy."  R. 259, 275.  Records from the Accent Eyecare Center reveal that Plaintiff needed a referral to a retinologist for evaluation.  R. 259.  On October 21, 2004, Plaintiff continued to complain of ankle swelling and had 1-2+ pitting edema in her lower extremity bilaterally.  R. 269, 385.  On March 17, 2005, Plaintiff had peripheral neuropathy by palpation.  R. 260.  In June, 2005, Plaintiff was examined and found to have swelling of her right leg, which was larger than her left leg, and she had pain on palpation of the calf.  R. 464.

---

[4] Plaintiff was "mildly overweight" in August, 1998.  R. 231.

On July 8, 2005, Plaintiff complained of right leg swelling and pain for six weeks, and said it was worse with walking.  R. 463.  Plaintiff had "been seen in the ER recently as well about two weeks ago, and even before that, about four weeks ago had another venous Doppler US [ultrasound] done."  *Id.*  Both came back negative, but Plaintiff reported her pain was worse when walking around.  *Id.*  Examination revealed grade two bilateral pitting edema, right leg worse than the left, with weak, but equal, dorsalis pedis pulses.  *Id.*  There was some darkening of the skin around the ankle, and the calves were still sore on palpation.  *Id.*  Plaintiff was scheduled for an arterial Doppler ultrasound of her right leg, given Darvocet for pain, and "advised on limiting walking."  *Id.*

Plaintiff underwent x-ray examination on July 19, 2005, at Doctors' Memorial Hospital due to right leg pain and swelling.  R 501.  The report revealed "severe peripheral vascular disease" of the right lower extremity.  R. 501.  The x-ray report also stated that the "left ankle brachial index [was] also very abnormal, 0.4," although the left lower extremity was not the subject of the x-ray.  *Id.*  The right "A/B index," which is assumed to be the ankle brachial index, was 0.5.  *Id.*  As will be noted ahead, these findings nearly met the requirements of Listing 4.12.

Plaintiff returned on July 22, 2005, for an interval evaluation of right leg pain and swelling.  R. 457.  Dr. Corpuz's diagnosis was "severe peripheral vascular disease of both legs" and he referred her for a vascular surgical evaluation by Dr. Jawde.  *Id.* Plaintiff complained that Darvocet was not really helping with her pain, so the prescription was changed to Mepergan Forte, with aspirin and Plavix continued.  *Id.*

Plaintiff saw Dr. Jawde for examinations on November 8 and 16, 2005, at the request of Dr. Corpuz, due to Plaintiff's disabling bilateral calf claudication, which was worse on the left. R. 312-313. Plaintiff said she had difficulty going up one flight of stairs, had severe pain, and could not walk a quarter of a block without needing to stop. R. 312, 601. Plaintiff was noted to be morbidly obese, and she had quit smoking in July. R. 312. It was recommended that she diet and lose weight. *Id.* She had no pulses below the femoral arteries. R. 601. An aortorgram and runoff were performed that day, which indicated "95% distal right femoral occlusion" a few inches long with two vessel runoff on the side. R. 312. On the left side, there was "total occlusion of the superficial femoral artery at its takeoff." There was a three vessel runoff with "minor irregularities." *Id.* Dr. Jawde determined that Plaintiff was "greatly disabled by her claudication." *Id.*

On February 8, 2006, Plaintiff was examined by Dr. Jawde due to "intractable" claudication in both lower extremities, worse on the right. R. 310. Plaintiff reported that her symptoms had progressed over several months, and she said she had pain on the right side characterized as "severe and disabling" due to her inability to walk a quarter of a block without having cramps and having to stop. *Id.* Plaintiff reported "wanting to be active" and said she worked "full time" and had stopped smoking four months earlier. *Id.* Pedal and popliteal pulses were absent on both sides, but both femoral pulses were present. *Id.* Femoral popliteal bypass surgery was deemed necessary and scheduled due to "intractable symptoms." R. 311. The diagnosis provided by Dr. Jawde was peripheral vascular disease. *Id.*

Plaintiff was hospitalized for the third time on February 14, 2006, for "disabling" claudication with femoral occlusion.  R. 307.  The left side was more symptomatic than the right side.  R. 309.  A left "in situ femoral popliteal bypass with the patient's autogenous saphenous vein combined with a profundoplasty" was performed.  R. 307. After the procedure, Plaintiff had a small complication, with bleeding in the wound which "required reexploration and hemostasis."  R. 309.  Following that, Plaintiff did well and at the time of her "discharge, her pedal pulses were strong and bounding."  *Id.*  Plaintiff had "the expected slight ankle edema."  *Id.*  Plaintiff was to continue her home diet and medications, was prescribed Percocet for pain, and released back to Dr. Corpuz.  *Id.*

At Plaintiff's follow-up on March 30, 2006, Dr. Corpuz noted that the left leg incision was "healing well."  R. 355.  Plaintiff "looked comfortable," was not "in any acute distress," and was "ambulatory without assistance."  *Id.*

On May 11, 2006, Plaintiff was seen for leg pain and swelling.  R. 352.  On May 26th, she was seen again after experiencing several days of left leg swelling and pain, which was worse with ambulation or standing.  R. 351.  Examination revealed warmth and puffiness with soreness noted on the leg and calf, although Plaintiff could ambulate without assistance.  *Id.*  Plaintiff was given a Toradol injection for pain.  *Id.*  Dr. Corpuz determined that if the Doppler study were negative, they would treat the thrombophlebitis with anti-inflammatories, and if positive, would treat with "subcu" Lovenox.  *Id.*  The ultrasound, taken to "rule out DVT," revealed no "evidence of deep vein thrombosis" on the left lower extremity.[5]  R. 350.

---

[5] Deep vein thrombosis is a condition marked by the formation of a thrombus within a deep vein (as of the leg or pelvis) that may be asymptomatic or be accompanied by

On June 2, 2006, Plaintiff was seen by Dr. Corpuz for a follow-up appointment concerning her left leg swelling. R. 349. She was then "still continuing to work as a correctional officer with her being on her feet all the time and climbing up stairs and doing a lot of walking." *Id.* He said that she became "much better" after rest on the weekend. *Id.* He noted the Doppler venous study was negative for deep vein thrombosis, and the Toradol shot only helped provide relief for one day. *Id.* Plaintiff continued to have mostly unilateral left pitting pedal edema, likely secondary to venous insufficiency. *Id.* Dr. Corpuz advised Plaintiff to use "compressive stockings every daytime, especially when she is at work, and to consider possibly retiring if she is about to do it anyway, and prop her legs up as often as possible . . . ." *Id.*

At her follow-up appointment on June 15, 2006, Plaintiff reported feeling "much better" and said she was being allowed to sit more often at her job rather than stand on her feet. R. 348. Plaintiff had "decreased pitting edema on the left lower leg" and was "ambulatory without assistance." *Id.* Dr. Corpuz diagnosed peripheral edema, unilateral, affected the left lower extremity, and prescribed a diuretic for ten days. *Id.*

On July 12, 2006, Plaintiff was found to have grade II bilateral pitting edema, left greater than right, although she admitted it was "better." R. 347. The left leg was significantly larger than the right leg, with a circumference of 45 compared to 39 on the right. R. 347. She also had left rotator cuff tendinitis. *Id.* Plaintiff complained of leg swelling again on July 22 and 25, 2006. R. 346.

---

symptoms (such as swelling and pain) and that is potentially life threatening if dislodgment of the thrombus results in pulmonary embolism—abbreviation DVT. Thrombosis is the formation or presence of a blood clot within a blood vessel. MEDLINE PLUS (MERRIAM-WEBSTER).

On September 29, 2006, Dr. Robert Steele, M.D., a non-examining State agency physician who reviewed the medical records, concluded that Plaintiff could perform light exertional activity. R. 314-321. Dr. Steele noted that there was no opinion from a treating or examining physician concerning Plaintiff's physical limitations. R. 320. In the block for a signature is the typewritten name Robert Steele, M.D.[6] R. 321.

Plaintiff was evaluated by psychologist Nina Barnes, Ph.D., on November 3, 2006, pursuant to the Commissioner's request. R. 322-324. Plaintiff reported that the reason she was applying for disability was swelling and pain in her legs, diabetes mellitus, high blood pressure, and anxiety attacks. R. 322. She said: "I can't hardly function with my legs. I've had an operation on both of them." *Id.* Plaintiff said she had vascular problems with her legs and "can only walk a short distance . . . ." *Id.* Plaintiff noted that she first had problems in August, 1998, when she had difficulty climbing stairs. *Id.* The condition has worsened since "1998 and progressed to the point where in August 2006 she was no[] longer able to perform her duties" as a correctional officer. R. 323. Plaintiff said that she has a driver's license, drives, fixes breakfast, washes dishes, sits down, and watches TV, and that though she does the household chores, she had to stop and rest frequently. *Id.* Plaintiff complained of anxiety attacks for which she takes medication, but said they "don't last more than a minute." R. 324. Plaintiff was diagnosed by Dr. Barnes with panic disorder without agoraphobia, and was found to be capable of managing her benefits without assistance. *Id.*

---

[6] In addition, there is a Disability Determination and Transmittal form dated November 8, 2006. R. 68. In the space for the physician's signature is typed: "See RFC dated 09/29/2006." *Id.* The physician is identified as Dr. Steele. *Id.*

Two State agency opinions, one on November 7, 2006, by Thomas Conger, Ph.D., and one on March 5, 2007, by Jane Cormier, Ph.D., found Plaintiff's mental impairment (anxiety related disorders) to be non-severe.  R. 327, 421.  Both were non-examining sources.

On November 16, 2006, Plaintiff reported bilateral leg pain at a 9 or 10 level on a 1 to10 scale, with pain worse in the left leg.  R. 343.  Plaintiff noticed that both her legs were getting "darker."  *Id.*  Plaintiff had grade II pedal "hard edema" with the left greater than the right, and decreased dorsal pulses bilaterally.  *Id.*

On December 12, 2006, Plaintiff complained of persisting leg pain, and had a right leg limp, but could ambulate without assistance.  R. 342, 634.  She said that the "samples worked well."  R. 634.

On January 12, 2007, Plaintiff complained of lower back pain during the past month and left leg pain and requested medication.  R. 341, 633.  She was noted to have grade II pitting edema.  R. 341, 633.

On February 12, 2007, a lumbar spine MRI revealed "[m]ild spinal canal stenosis" from L3-4 to L5-S1.  R. 652.  "There were mild circumferential disc bulges" but "only minimal neural foraminal narrowing."  *Id.*

On February 27, 2007, Plaintiff's progress notes indicate she still had left leg pain, her foot felt "numb & turning black" and she had no pedal edema.  R. 631.

On March 6, 2007, Dr. David Guttman, M.D., who was a second non-examining State agency physician, opined that Plaintiff could perform light exertional activity.  R. 436.  Dr. Guttman concluded that although Plaintiff was not capable of doing "heavy work," she was "capable of performing work such as [Plaintiff had] performed in the past

as a correctional officer."  R. 70-71.  Dr. Guttman also indicated that no treating or

examining physician opinions were in the file concerning Plaintiff's physical limitations.

R. 441.  Again, there was no signature on the form, but a typewritten name identified the

opinion as from Dr. Guttman.[7]  R. 442.

A second MRI scan of the lumbar spine taken on October 11, 2007, determined

that there were "small diffuse disk bulges at L2-3, L3-4, and L4-5" and "mild narrowing

of the central canal at L3-4 . . . ."  R. 649.  The report said that a "[c]ongenitally narrow

spinal canal is present, secondary to congenitally short pedicles."  *Id.*  "No significant

foraminal stenosis" was identified.  R. 650.

On February 7, 2008, Plaintiff was treated for pain due to right frozen shoulder,

for which she was given a steroid injection of Lidocaine.  R. 572.  She could not raise

her arm above 90 degrees.  *Id.*  Plaintiff also had bilateral lower extremity pain due to

diabetic neuropathy for which she was prescribed Neurontin because Lyrica was not

working.  R. 573.  At Plaintiff's follow-up visit on February 19, 2008, it was determined

that Plaintiff's diabetes mellitus, Type II was "not well controlled."  R. 571.  That record

indicates Plaintiff was also "out of her medications and is concerned that she is going to

run out of her insurance later this month and wants to change her prescriptions to

generic."  *Id.*  The follow-up visit on February 28, 2008, also indicated that Plaintiff's

blood sugars were "still running very high."  R. 570.

---

[7] The Disability Determination and Transmittal form has the Physician's name typed
as "David Guttman, M.D. 32" and in the signature block contains this typed information:
"See RFC dated 03/06/2007."  R. 70.

In April, 2008, Plaintiff had moderate to marked depression. R. 609. She also complained of left leg pain. *Id.*

On May 19, 2008, Plaintiff had severe peripheral vascular disease with femoral pulses present but faint pedal pulses with her feet in poor condition. R. 608. On September 3, 2008, Plaintiff complained of cramps in both legs and she had pitting edema. R. 617.

On September 15, 2008, Dr. Corpuz signed a form indicating that he had "reviewed the descriptions of the physical exertional requirements in Social Security Regulations 404.1567" and felt Plaintiff was capable of performing only "sedentary work." R. 654. The form was submitted to the ALJ on September 16, 2008, R. 655, seven days after the administrative hearing, held on September 9, 2008, R. 28, but several months before the administrative decision. R. 655, 27.

**Legal analysis**

Plaintiff presents two primary arguments for reversing or remanding the ALJ's decision. Plaintiff contends that the ALJ erred in (1) rejecting the opinion of treating physician Dr. Corpuz, and relying on unsigned opinions of non-examining sources and (2) finding Plaintiff's allegations to be not entirely credible. Doc. 23, p. 1. Defendant argues that the ALJ's opinion is supported by substantial evidence, and, due to inconsistent objective medical evidence, the treating physician's opinion was entitled to little weight. Doc. 28, pp. 4-6.

### Whether the ALJ erred in failing to give substantial weight to the opinion of the treating physician

The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Winschel v. Commissioner of Social Sec., 631 F.3d 1176, 1179 (11th Cir. 2011). This is so because treating physicians:

> are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2). Important to the determination of whether there is a "detailed, longitudinal picture" of impairments is the length of the treatment relationship, the frequency of examination, the extent of the knowledge of the treating source as shown by the extent of examinations and testing, the evidence and explanation presented by the treating source to support his or her opinion, the consistency of the opinion with the record as a whole, and whether the treating source is a specialist with respect to the particular medical issues. 20 C.F.R. § 404.1527(d)(2)-(5).

The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated. Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir. 2004). "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).

This circuit finds good cause to afford less weight to the opinion of a treating physician "when the: (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Winschel, 631 F.3d at 1179; Phillips v. Barnhart, 357 F.3d 1232, 1240-1241(11th Cir. 2004); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991) ("The treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory.").  *See also*, Crawford v. Commissioner Of Social Security, 363 F.3d 1155, 1159 (11th Cir. 2004) (finding good reasons articulated by the ALJ to discount the treating physician's opinion).

### Whether the non-examining opinions were unsigned and not entitled to any weight as evidence

Plaintiff contends that the ALJ relied on "unverified opinions from non-examining sources."  Doc. 23, p. 11.  Plaintiff argues that the Rules require state agency physician opinions to be signed.  Doc. 23, p. 11.  She points to POMS DI 26510.089, § B which she alleges provides: "The typed name of an MC/PC on an electronic message or worksheet is not considered a true signature."  *Id.*  Furthermore, Plaintiff argues that Agency documents containing only a typed name should be rejected as unauthenticated and unreliable.  *Id.*, at 11, *citing* Wade v. Astrue, 2008 WL 4538997, *2 (N.D. Ind., Oct. 7, 2008).  In Wade, the claimant's psychiatric review technique and mental residual functional capacity assessment forms were not signed, but contained typed names.  Wade, 2008 WL 4538997, * 2.  The court also noted the Commissioner did not provide

any support for the argument that the forms were "reliable because they included typed

signatures." *Id.*

The rule cited by Plaintiff applies to the initial case processing and states that:

Once the MC/PC completes the medical portion of the disability
determination, he or she must choose one of the following signature
options: [1] Sign only the appropriate medical assessment form(s), as
instructed in DI 26510.089B.1.a; or [2] Sign both the disability
determination form(s) and the appropriate medical assessment form(s), as
instructed in FI 26510.089B.2.

POMS DI 26510.089, § B.[8]  However, under POMS DI 26510.089, § A.4:

Each medical assessment form must have a reviewing MC/PC's actual
physical signature *or an approved electronic signature* - unless the DE is a
single decisionmaker (SDM).

(Emphasis added).  Thus, the rule expressly provides for an approved electronic

signature.

Furthermore, Defendant points to rules under the Electronic Disability Guide

Procedures for the Electronic Process.  POMS DI 810.  POMS DI 81020.130, Electronic

Case Closure.[9]  This policy provides:

The Disability Examiner (DE) completes the disability determination forms
(e.g., SSA-831/832/833), Personalized Disability Notices (PDNs), and any
supplemental rationales by using the Disability Determination Services
(DDS) case processing systems.  These forms are signed with an
approved electronic signature via the DDS case processing system and
do not require a handwritten signature.

---

[8] This is available at:

https://secure.ssa.gov/apps10/poms.nsf/lnx/0426510089

[9] This is available at:

https://secure.ssa.gov/apps10/poms.nsf/lnx/0481020130

Plaintiff's argument on this issue is unpersuasive.

## The evaluation of the treating physician's opinion

The ALJ gave "little weight" to the opinion of Dr. Corpuz that Plaintiff is limited to sedentary work. R. 26. He reasoned that the "MRI scans, x-rays and Doppler ultrasounds did not reveal any significant abnormalities." *Id.* He further reasoned that Plaintiff had received only conservative treatment and she had not been referred to any specialist for back or shoulder pain. *Id.* He then gave "great weight" to the opinion of the non-examining state agency "medical consultant," Dr. Guttman, who determined that Plaintiff can do light work but could not be exposed to extreme heat or cold. *Id.* He assigned lesser weight to the non-examining state agency "medical consultant," Dr. Steele, who said that Plaintiff "is not as limited as found." *Id.*

These are not adequate reasons to give little weight to the opinion of Dr. Corpuz. The ALJ may not impose his own medical judgment as to the "conservative" nature of treatments as a reason, standing alone, to disregard an opinion of a treating physician. Burgess v. Astrue, 537 F.3d 117, 129 (2nd Cir. 2008). It is, however, appropriate to discount a treating physician's opinion if conservative treatment has resulted in improvements, Peters v. Astrue, 232 Fed.Appx. 866, 871 (11th Cir. Apr 16, 2007) (not selected for publication in the Federal Reporter, No. 06-15958), but that is not the case here. Plaintiff had three surgeries for peripheral arterial neuropathy and after each surgery, her impairments recurred. Further, three surgeries is not "conservative" treatment.

The two MRI scans were of Plaintiff's spine. Plaintiff alleges disability due to peripheral artery disease of her legs. Plaintiff does not allege disability due to spinal

defects. Similarly, whether or not Plaintiff received only conservative treatment for back and shoulder pain is beside the point.

The x-ray evidence, however, did concern the severity of Plaintiff's peripheral artery disease. On August 4, 2003, an x-ray report revealed "mild peripheral vascular disease, both lower extremities." R. 256. This is some evidence that Plaintiff's problems were mild on the date of the x-ray. But the evidence cannot be viewed in isolation. In August, 1998, Plaintiff had surgery for "disabling claudication" of her entire right leg. R. 231, 374, 241, 243. She had no complications and "maintained bounding pulses in the entire postoperative period." R. 251. Apparently she did not begin to have a recurrence of her problems for about five years, and the x-rays on August 4, 2003, revealing "mild peripheral vascular disease, both lower extremities," was only the beginning. R. 256. In January, 2004, and again in June, 2004, Plaintiff complained of pain in the middle of her back, ankle swelling, and numb fingers; her blood sugars were "up & down," her diabetes was under "very poor control," and she had diabetic neuropathy and "significant diabetic retinopathy." R. 259, 275. Records from the Accent Eyecare Center reveal that Plaintiff need a referral to a retinologist for evaluation. R. 259. By October, 2004, Plaintiff continued to complain of ankle swelling and had 1-2+ pitting edema. R. 269, 385. On March 17, 2005, Plaintiff had peripheral neuropathy. R. 260. In June, 2005, Plaintiff was examined and found to have swelling of her right leg, which was larger than her left leg, and she had pain on palpation of the calf. R. 464.

On July 8, 2005, Plaintiff complained of right leg swelling and pain for six weeks, and said these symptoms were worse with walking. R. 463. Plaintiff had "been seen in

the ER recently as well about two weeks ago, and even before that, about four weeks ago had another venous Doppler US [ultrasound] done." *Id.* Both came back negative, but Plaintiff reported her pain was worse when walking around. *Id.* Examination revealed grade two bilateral pitting edema, right leg worse than the left, with weak, but equal, dorsalis pedis pulses. R. 463. There was some darkening of the skin around the ankle, and the calves were still sore on palpation. *Id.* Plaintiff was scheduled for an arterial Doppler ultrasound of her right leg, given Darvocet for pain, and "advised on limiting walking." R. 463.

Plaintiff then underwent a second x-ray testing on July 19, 2005, at Doctors' Memorial Hospital, which revealed "*severe* peripheral vascular disease" of the right lower extremity, with pressure abnormalities on the left. R. 501 (emphasis added). The "left ankle brachial index [was] also very abnormal, 0.4." *Id.* The right "A/B index," which is assumed to be the ankle brachial index, was 0.5. *Id.*

Thus, from 2003 to 2005, Plaintiff's condition grew steadily worse. Indeed, the results from the July 19, 2005, x-ray almost met the severity of Listing 4.12 A. That Listing provides:

> 4.12 Peripheral arterial disease, as determined by appropriate medically acceptable imaging (see 4.00A3d, 4.00G2, 4.00G5, and 4.00G6), causing intermittent claudication (see 4.00G1) and one of the following:
>
> A. Resting ankle/brachial systolic blood pressure ratio of less than 0.50.

See http://www.ssa.gov/OP_Home/cfr20/404/404-ap10.htm. The Listing was met for the left ankle brachial index.

The ALJ also discounted the opinion of Dr. Corpuz because there had been a normal Dopper ultrasound. The July, 2005, ultrasound was negative, but this was the same month in which the x-ray revealed severe peripheral vascular disease of the right lower extremity, and a very abnormal left ankle brachial index. R. 501. In summary, the x-ray evidence is not substantial evidence in the record to discount the opinion of Dr. Corpuz.

The Doppler ultrasound was to determine whether Plaintiff had deep vein thrombosis, that is, blood clots in the deep veins of her legs. She did not. But that she did not have deep vein thrombosis is not a reason to discount all of the other evidence that she has significant peripheral artery disease.

This leaves for consideration whether the opinions of the non-examining state agency physicians were substantial evidence in the record to discount the opinion of Dr. Corpuz. "The opinions of nonexamining, reviewing physicians . . ., when contrary to those of the examining physicians, are entitled to little weight, and standing alone do not constitute substantial evidence." Sharfarz v. Bowen, 825 F.2d 278, 280 (11th Cir. 1987). *See also*, Swindle v. Sullivan, 914 F.2d 222, 226 n.3 (11th Cir.1990) (the opinion of a non-examining physician is "entitled to little weight and taken alone does not constitute substantial evidence to support an administrative decision" ), *citing*, Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir.1985).

Further, the opinions of Drs. Steele and Guttman were rendered on September 29, 2006, and March 6, 2007, respectively, did not consider the 2008 opinion of Dr. Corpuz. Since the medical opinions of the non-examining physicians were not based on complete medical records as noted above, it was error to give those records greater

weight than the opinion of the treating physician. *See* Russell v. Astrue, 742 F.Supp.2d 1355, 1378 (N.D. Ga., 2010); O'Neal v. Astrue, No. 5:08-cv-322, 2010 WL 431868, *8 (N.D. Fla. Feb. 2, 2010) (a non-examining doctor's opinion was entitled to little weight where it was not based the complete record); Lumpkin v. Barnhart, 485 F.Supp.2d 1270, 1282 (S.D. Ala. 2006) ("[T]he opinion of the non-examining medical examiner cannot be given any value in that it was given based on the evidence that . . . represents, at most, only half of the record evidence. . . .").

Here, the medical records provide a long history of severe peripheral vascular disease in both legs, multiple surgeries, and continued problems which support the opinion of Dr. Corpuz. The ALJ erred in this case by failing to give substantial weight to the opinion of the treating physician, Dr. Corpuz that Plaintiff is limited to sedentary work during the relevant period, from August 31, 2006, through November 24, 2008.

**Whether the ALJ erred in determining that Plaintiff's testimony as to the severity of her symptoms was not credible to the degree alleged**

Pain and other symptoms reasonably attributed to a medically determinable impairment are relevant evidence for determining residual functional capacity. Social Security Ruling 96-8p, p. 4. Pain and other symptoms may affect either exertional or non-exertional capacity, or both. *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain. *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so. *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987). Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law,

that the testimony be accepted as true.  *See Cannon v. Bowen*, 858 F.2d
1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).  The reasons articulated by

the ALJ for disregarding the claimant's subjective testimony must be based upon

substantial evidence.  Jones v. Department of Health and Human Services, 941 F.2d

1529, 1532 (11th Cir. 1991).  It is not necessary that the ALJ expressly identify this

circuit's standard if his findings "leave no doubt as to the appropriate result" under the

law.  Landry v. Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).

The ALJ found Plaintiff's testimony concerning her pain not entirely credible

because she had had conservative medical treatment.  R. 25.  Again, however, Plaintiff

had three surgeries for peripheral arterial neuropathy.  After each surgery, her condition

improved for a short time and then her impairments returned.

The ALJ noted the fact that MRIs did not reveal deep vein thrombosis, R. 25, but

as discussed above, that she did not have blood clots does not mean that she did not

experience significant limiting pain from peripheral vascular disease, increasing in

severity over time.

The ALJ noted that the MRI scans of Plaintiff's lumbar spine revealed only mild

degenerative changes, and x-rays of her should were normal.  R. 25.  This is not a

sufficient reason to disbelieve Plaintiff.  She alleges disability due to peripheral arterial

neuropathy, not spinal and shoulder impairments.

The ALJ found that since Plaintiff could perform a "wide array" of daily activities,

her testimony was not entirely credible.  R. 25.  This finding overlooks Plaintiff's

testimony that she is in pain when she washes dishes and does other household

chores, cannot stand for very long, and has to sit down often. The activities are not inconsistent with Plaintiff's testimony concerning her pain.[10]

Furthermore, the ALJ noted that Plaintiff had reported her chronic leg pain and peripheral artery disease for years, but was able to work full time.  R. 25.  The fact that Plaintiff had been able to work in the past does not necessarily lead to the conclusion that Plaintiff could continue to do so, especially since the medical evidence shows that despite surgeries, her condition continued to deteriorate.

The ALJ reasoned that Plaintiff's testimony was not credible because Dr. Corpuz had determined that she could do sedentary work.  R. 25.  As noted above, the opinion of Dr. Corpuz was entitled to substantial weight, and his opinion is substantial evidence in the record to discount the testimony of Plaintiff, to the extent that a capability of doing sedentary work conflicts with her self-described limitations.  Thus, to the extent that the ALJ determined to discount Plaintiff's testimony that she can remain seated for "about

---

[10] Ross v. Apfel, 218 F.3d 844, 849 (8th Cir. 2000) ("The ability to perform sporadic light activities does not mean that the claimant is able to perform full time competitive work."); Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (the court must consider the entire record when determining whether the evidence of a claimant's daily activities is substantial evidence for the conclusion that she retains the residual functional capacity to work); Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997) ("Nor do we believe that participation in everyday activities of short duration, such as housework or fishing, disqualifies a claimant from disability or is inconsistent with the limitations recommended by Lewis's treating physicians."); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (when considering daily activities, the entire record must be considered, including the claimant's testimony that she had to lie down after two hours of such work); Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (a conclusory citation to a claimant's "daily activities" as a basis for failing to believe her testimony as to pain was insufficient where there was a medical condition that reasonably could have given rise to the pain described, and, although she testified that she cooked and shopped for herself, she had trouble putting on her clothing).

20 or 30 minutes," R. 37-38, that determination is supported by substantial evidence in the record.

Consequently, for the most part, the ALJ's determination that Plaintiff's testimony was not credible is not supported by substantial evidence in the record. It is supported only to the extent that the ALJ made a finding consistent with the opinion of Dr. Corpuz, that Plaintiff can do sedentary work.

**Conclusion**

It has long been the rule in this circuit that: "Where the Secretary has ignored *or* failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true." MacGregor, 786 F.2d at 1053 (emphasis added); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1217 (11th Cir. 1991); Critchfield v. Astrue, 2009 WL 635698 (N.D. Fla. Mar 10, 2009) (No. 308cv32-RV/MD); Cole v. Barnhart, 436 F.Supp.2d 1239 (N.D. Ala. 2006) (finding that the opinions of the treating physician must be accepted as true where the ALJ "did not properly refute them" but did not ignore them).

But there is now some doubt as to whether that is the proper procedure. In Winschel, *supra*, the court said:

> The ALJ did not mention the treating physician's medical opinion, let alone give it "considerable weight." Likewise, the ALJ did not discuss pertinent elements of the examining physician's medical opinion, and the ALJ's conclusions suggest that those elements were not considered. It is possible that the ALJ considered and rejected these two medical opinions, but without clearly articulated grounds for such a rejection, we cannot determine whether the ALJ's conclusions were rational and supported by substantial evidence.

631 F.3d at 1179. The court remanded to correct this error. *Id.*

In <u>Harris v. Astrue</u>, 546 F.Supp.2d 1267 (N.D. Fla. 2008) (No. 5:07cv44-RS/EMT), the court likewise remanded, not because the ALJ had failed to mention or discuss the treating physician's opinion, but because the ALJ gave improper reasons to discount the opinion of a treating physician (did not refute it), but did not ignore it. <u>Harris</u> distinguished <u>MacGregor</u> as a case where the ALJ made no finding as to the weight of the opinion of the ALJ, *i.e.*, he *ignored* the opinion. 786 F.Supp.2d at 1282.

In <u>Norman v. Commissioner of Social Sec.</u>, 2011 WL 824802, *2 (M.D. Fla. Feb. 14, 2011) (No. 6:09-CV-1594-ORL-31), *Report and Recommendation Adopted by* 2011 WL 825623 (M.D. Fla. Mar. 3, 2011), where the ALJ failed to follow this circuit's rules for evaluating a treating physician's opinion, remand was recommended because the evidence did not establish "disability beyond doubt" or that the claimant had "suffered an injustice." Citing <u>Winschel</u>, the court said that "the weight to be given such evidence is for the ALJ to determine, not the Court." *Id.*, at *12, n. 11. To like effect is <u>Herrera v. Astrue</u>, 2011 WL 816797 (M.D. Fla. Mar. 2, 2011) (No. 3:10-CV-00293-J-JBT) (remanding).

I believe that the proper course in this case is to follow the older cases. The ALJ here did evaluate the opinion of the treating physician, but failed to support his conclusion with substantial evidence in the record. Accordingly, the opinion of Dr. Corpuz, that Plaintiff is limited to sedentary work during the period in question, is established. The consequence of that finding, however, should be determined by the ALJ on remand for the relevant period, from August 31, 2006, through November 24, 2008.

**Recommendation**

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner be **REVERSED**, and that the case be **REMANDED** so that the Commissioner may determine whether Plaintiff's limitation to sedentary work for the period from August 31, 2006, through November 24, 2008, rendered her disabled and entitled to benefits.

**IN CHAMBERS** at Tallahassee, Florida, on April 19, 2011.


  s/      William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**



**<u>NOTICE TO THE PARTIES</u>**

A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.